GNS, INC. and Slot, Inc., South Dakota Corporations, Plaintiffs,

v.

The WINNEBAGO TRIBE OF NEBRAS-KA, a Federally Chartered Indian Tribe and February Corporation under 25 U.S.C. § 476, Defendant.

No. C 94–4021.

United States District Court, N.D. Iowa, Western Division.

May 3, 1994.

**1186**

Timothy A. Clausen, William K. Stoos, Klass Hanks Stoos Stoik Villone, Sioux City, IA, for plaintiffs.

Charles T. Patterson, Margaret M. Prahl, Eidsmoe Heidman Redmond Fredregill, Sioux City, IA, James E. Townsend, Vernle C. Durocher, Michael E. Florey, Dorsey & Whitney, Minneapolis, MN, for defendant.

### ORDER

JARVEY, United States Magistrate Judge.

This matter comes before the court pursuant to defendant's April 18, 1994, motion to dismiss application for temporary and permanent injunction (docket number 11). Plaintiffs resisted the motion to dismiss on April 22, 1994. Also on April 22, 1994, upon consent of the parties, this matter was referred to the undersigned United States Magistrate Judge for all further proceedings. The court held oral argument on the motion on April 28, 1994. The motion to dismiss is granted.

In this lawsuit, plaintiffs GNS, Inc., and SLOT, Inc. (collectively, the Managers), complain that the defendant Winnebago Tribe of Nebraska (the Tribe) is attempting in bad faith to eject the managers of the Tribe's gambling enterprise in breach of a management agreement and without pursuing arbitration as required by the agreement. The Managers have applied for a temporary and permanent injunction to compel the Tribe to submit to arbitration of this dispute, and to prevent expulsion of the Managers from the casino, interference in the Managers' management of the casino, or interference with income distribution from the casino during the pendency of the arbitration. The Tribe asserts that it has recently taken actions against the Managers for failure to comply with applicable gaming regulations and that actions pursuant to the gaming regulations are not subject to arbitration under the Agreement.

In the present motion, the Tribe argues that this court lacks jurisdiction to entertain the application for preliminary and permanent injunction because the Tribe has sovereign immunity from suit in federal court. The Managers argue that the Tribe has waived sovereign immunity by entering into the contract requiring arbitration and that sovereign immunity does not bar this action for equitable relief.

The Managers entered into the management agreement with the Tribe in the wake of the Tribe's ejection of the prior management company, Investment Finance Management Co., Inc. (IFM). In litigation between IFM and the Tribe in this court, *Investment Finance Management Co., Inc. v. Schmit Indus., Inc., et al.,* No. C86-4234, 1991 WL 635929 (N.D.Iowa; filed July 3, 1991), The Honorable Donald E. O'Brien ruled that this district court had federal question jurisdic-

tion pursuant to 28 U.S.C. § 1331 to consider whether the contract between IFM and the Tribe had been approved by the Bureau of Indian Affairs as required by 25 U.S.C. § 81. The court also found that the Tribe, by entering into the contract with IFM in its capacity as a federal corporation pursuant to Section 17 of the Indian Reorganization Act (IRA) of June 18, 1934, 25 U.S.C. § 477, and not as a governmental entity pursuant to Section 16 of the IRA, 25 U.S.C. § 476, had waived its sovereign immunity. The court therefore granted IFM's motion for an injunction barring the Tribe from using for any purpose premises built by IFM at the Tribe's gambling enterprise near Sloan, Iowa. In a previous order in the IFM case, the court had concluded that further attempts to exhaust tribal court remedies would be futile. IFM and the Tribe subsequently settled IFM's lawsuit, clearing the way for the Tribe to reopen its gambling enterprise under new management.

On May 15, 1991, the Managers entered into a Management Agreement with the Tribe under which the Managers were to manage the Tribe's gambling enterprise, called Winn–A–Vegas Casino, near Sloan, Iowa. The May 1991 agreement was subsequently amended and restated on July 15, 1991 (the Agreement). Plaintiffs' Exhibit 1 attached to Application for Temporary and Permanent Injunction (hereinafter, Plaintiffs' Exhibit 1). The Agreement states that it is between the Managers and the Tribe in its capacity as "a federally recognized Indian tribe pursuant to Section 16 of the Indian Reorganization Act (IRA) of June 18, 1934, codified as amended at 25 U.S.C. Section 476." *Id.*

The Agreement contains the following arbitration clause:

Any dispute arising out of the interpretation of language in this Agreement shall be submitted to the American Arbitration Association under its rules then in force. Both parties shall be bound by the arbitrator's decision, and judgment upon such decision may be entered in the Winnebago Tribal Court.

*Id.* at § 11.06. The Agreement also contains the following clause:

MANAGER hereby agrees to and shall at all times comply with all terms and conditions of this Agreement, the Gaming Ordinance and the [Indian Gaming Regulatory] Act[, 25 U.S.C. § 2701, *et seq.,*] and regulations promulgated thereunder in carrying out its responsibilities. In addition, the MANAGER agrees to comply with the licensing and bonding requirements of the Gaming Ordinance.

*Id.* at § 6.02. In § 3.01 of the Agreement, the Managers agreed to provide all necessary information and to bear the costs of any background investigations required under the Act. Finally, the Agreement provides in § 11.09 that

[b]y entering into this Agreement, the TRIBE does not waive, limit or modify its sovereign immunity from unconsented suit.

*Id.* at § 11.09.

The Bureau of Indian Affairs approved the Agreement between the Managers and the Tribe on October 15, 1991, and the Managers began to operate the Tribe's gambling enterprise in April of 1992. Pursuant to the Agreement, the Managers have successfully operated the Tribe's casino, often distributing in excess of $1 million a month to the Tribe as its share of the profits from the casino. The casino employs over six hundred people, of whom almost one-third are members of the Winnebago tribe and an additional one-sixth or more are non-Winnebago Native Americans.

The Managers allege that between April 1992 and the present, the Tribe has undertaken a series of bad faith actions to interfere with the Managers' operation of the casino, culminating in forcible ejection of the Managers and their employees from the casino in March of 1994. These actions allegedly include a resolution of the Tribal Council requiring the concurrence of tribal member Cecilia Earth in all hiring and firing decisions for the casino and another Tribal Council resolution requiring the Managers to hire Mike Bonner as Controller of the casino, both actions the Managers claim violate their right to make hiring and firing decisions. The Managers allege that the Tribal Gaming Commission passed new rules and regula-

tions intended to punish the Managers and to violate the Management Agreement by imposing unlawful taxes and fees. Finally, the Managers allege that the Tribe directed them to pay $150,000 upon a few days notice for background checks which the Managers claim were duplicative of background checks by the Iowa Division of Criminal Investigation required under the gambling compact with the State of Iowa for which the Managers had already paid $20,000.

The Tribe asserts that it has taken actions to comply with the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.,* including passage of the Winnebago Tribe of Nebraska Gaming Ordinance of 1992 (Gaming Ordinance). In September of 1993, pursuant to IGRA, the Gaming Ordinance was submitted to the National Indian Gaming Commission (NIGC) for approval. On December 10, 1993, the Chairman of NIGC notified the Tribe that provisions of the Gaming Ordinance concerning procedures for background investigations of key casino employees were inadequate. The Tribe therefore adopted an Amended and Restated Gaming Code (Gaming Code) on January 17, 1994, which was amended on February 7, 1994, and approved by NIGC on March 23, 1994.

Pursuant to the Gaming Code and its predecessor Gaming Ordinance, the Tribe asserts, the Tribal Gaming Commission began regulating the Tribe's gaming operation. Key personnel of the Managers had been granted temporary gaming licenses on April 14, 1993, which were to expire October 14, 1993. These licenses were extended to April 14, 1994. On February 15, 1994, the Gaming Commission directed the Managers to submit an operator license application, application forms and fees, to the Gaming Commission by February 25, 1994, and to submit a check for the estimated cost of the necessary background checks. The Managers were granted a one-week extension of the deadline to submit their applications and fees. The Managers did not submit applications, but instead demanded arbitration on February 22, 1994. On March 3, 1994, the Gaming Commission sent a notice of non-compliance with the licensing application directives which gave the Managers five days to cure or ten days to request a hearing. On March 3, 1994, the Managers filed the present application for injunctions and have not complied with the licensing directives. The Managers did not appear at an April 1, 1994, hearing before the Gaming Commission and their temporary gaming licenses expired on April 14, 1994. On April 16, 1994, the Gaming Commission voted to expel the Managers from the gaming facility pursuant to the Gaming Code, the gaming compact with the State of Iowa, and IGRA. On April 18, 1994, by order of the Gaming Commission, the Tribe removed the Managers from the Tribe's casino.

## CONCLUSIONS OF LAW

■ Indian tribes are "domestic dependent nations," which exercise inherent sovereign authority over their members and territories. *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991) (citing *Cherokee Nation v. Georgia,* 5 Pet. 1, 17, 8 L.Ed. 25 (1831)). Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation. *Id.* (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978)). To be effective, an Indian tribe's waiver of sovereign immunity must be unequivocally expressed and may not be implied. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58–59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978); *American Indian Agricultural Credit Consortium v. Standing Rock Sioux Tribe,* 780 F.2d 1374, 1378 (8th Cir.1985).

■ Pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.,* an Indian Tribe may organize simultaneously in two ways: first, it may organize as a tribal governmental entity governed by a constitution and bylaws pursuant to 25 U.S.C. § 476 (a so-called Section 16 organization); second, it may incorporate as a federal corporation governed by the terms of its charter pursuant to 25 U.S.C. § 477 (a so-called Section 17 corporation). The Section 16 governmental entity and Section 17 federal corporation are separate legal entities. *Gaines v. Ski Apache,* 8 F.3d 726, 729 (10th Cir.1993).

This court has held that a Section 17 corporation waives sovereign immunity. *Investment Finance Management Co., Inc. v. Schmit Indus., Inc., et al.,* No. C86–4234, slip op. at 12 (N.D.Iowa; filed July 3, 1991) (The Honorable Donald E. O'Brien, then C.J.) (citing *Maryland Cas. Co. v. Citizens Nat'l Bank,* 361 F.2d 517 (5th Cir.), *cert. denied,* 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966)).

■ The Tribe entered the present Agreement, however, as a Section 16 governmental entity. The Agreement is between the Managers and the Tribe in its capacity as "a federally recognized Indian tribe pursuant to Section 16 of the Indian Reorganization Act (IRA) of June 18, 1934, codified as amended at 25 U.S.C. Section 476." Plaintiffs' Exhibit 1. The Tribe has not waived sovereign immunity, as it did in the IFM case, simply because of the form of the legal entity that entered into the Agreement. Furthermore, there is no express waiver of sovereign immunity in the Agreement. On the contrary, § 11.06, quoted above, expressly reserves the Tribe's sovereign immunity.

The Managers argue that the Tribe cannot raise sovereign immunity from a suit for injunctive relief for two reasons. First, the Managers argue that, by providing for arbitration of disputes under the Agreement, the Tribe has waived sovereign immunity. Second, the Managers argue that sovereign immunity is no bar to a suit for equitable relief based on bad faith conduct of the Tribe.

■ Whether and to what extent an arbitration clause constitutes a waiver of an Indian tribe's sovereign immunity turns on the terms of that clause. *Pan American Co. v. Sycuan Band of Mission Indians,* 884 F.2d 416, 419 (9th Cir.1989). In *Pan American,* the arbitration clause in question provided that

> [i]n the event a dispute arises between its parties … either party may seek arbitration of said dispute and both parties do hereby subject themselves to the jurisdiction of the American Arbitration Association and do agree to be bound by and comply with its rules and regulations as promulgated from time to time.

*Id.* Pan Am read the arbitration clause as an explicit waiver of the tribe's sovereign immunity since "a submission to arbitration is a submission to judicial jurisdiction … as a matter of definition." *Id.* However, the Ninth Circuit Court of Appeals concluded that

> [s]uch a reading of the arbitration clause runs counter to not only the strong presumption against tribal waivers of immunity, but also generally accepted principles governing the interpretation of contractual arbitration provisions.

*Id.* The court rejected Pan Am's argument that the arbitration clause without a waiver of sovereign immunity would "merely be a trap for the unsuspecting" leaving Pan Am without a judicially enforceable remedy for the tribe's breach of contract. *Id.* The court concluded that "Indian sovereignty, like that of other sovereigns, is not a discretionary principle subject to the vagaries of the commercial bargaining process or the equities of a given situation." *Id.* (citing *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 513, 60 S.Ct. 653, 656–57, 84 L.Ed. 894 (1940)). The court therefore held that finding waiver on the basis of an arbitration clause would be impermissible because it would be finding consent by implication. *Id.*

■ In the present case, the court notes that there can be no question of consent by implication because the arbitration clause involved here specifically reserves to the Winnebago Tribal Court the authority to enter judgment on the basis of an arbitrator's decision. *See* Plaintiffs' Exhibit 1 at § 11.06. The arbitration clause here does not provide an unequivocal consent to waiver of the Tribe's sovereign immunity.

The Managers next argue that sovereign immunity provides no bar to suit for equitable relief based on the Tribe's bad faith conduct. In *Nat'l Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), the Court considered whether a non-Indian must first exhaust remedies in tribal court before an injunction could issue in federal court. In a footnote, the Court suggested in dicta that exhaustion

of remedies in tribal court would not be required

> where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith,' cf. *Juidice v. Vail,* 430 U.S. 327, 338 [97 S.Ct. 1211, 1218, 51 L.Ed.2d 376] (1977), or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction.

*Nat'l Farmers Union,* at 856 n. 21, 105 S.Ct. at 2454 n. 21. Similarly, in his concurrence in *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), Justice Stevens concluded that the majority had impliedly recognized that tribal sovereign immunity does not necessarily extend to actions seeking equitable relief. *Potawatomi Indian Tribe,* 498 U.S. at 514–16, 111 S.Ct. at 912–13. The court has only found two district court decisions in which this reasoning was followed to overcome sovereign immunity. In both cases, the courts held that sovereign immunity cannot be invoked to preclude an inquiry in federal court for the narrow purpose of determining whether or not a tribe has complied with the requirements of IGRA, 25 U.S.C. § 2701 *et seq.,* on the ground that to hold otherwise would make IGRA a nullity. *See Maxam v. The Lower Sioux Indian Community of Minnesota,* 829 F.Supp. 277, 281–82 (D.Minn.1993) (Hon. Paul A. Magnuson, J.); *Ross v. Flandreau Santee Sioux Tribe,* 809 F.Supp. 738, 744–745 (D.S.D.1992) (Hon. John B. Jones, J.). In both cases, the members of a tribe challenged the tribe's distribution of gaming income to its members as not in compliance with IGRA. The courts concluded that allowing sovereign immunity to bar a suit by members of a tribe to enforce the requirements of IGRA would be to allow a tribe to conduct gaming in violation of the Act with impunity.

■ The Managers argue that "[c]learly the case before this Court involves numerous issues as to whether the Tribe has complied with IGRA." Plaintiffs' Resistance to Motion to Dismiss, at p. 6. The Managers seek equitable relief on the basis of an alleged breach of contract and refusal to arbitrate. The Managers cannot rely on the anticipated IGRA defense of the Tribe to assert federal jurisdiction. *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 7–12, 103 S.Ct. 2841, 2845–48, 77 L.Ed.2d 420 (1983); *Middle South Energy v. Ark. Public Serv. Comm'n,* 772 F.2d 404, 409 (8th Cir.1985).

The Managers have not pleaded claims that meet the conditions suggested in *Nat'l Farmers Union* which would preclude invocation of sovereign immunity as a bar to the action. Although the Managers have pleaded allegations that, if true, show bad faith conduct by the Tribe, the Managers have not alleged facts upon which this court could conclude that *the assertion of tribal court jurisdiction* is in bad faith or intended to harass. Rather, invocation of tribal court jurisdiction is pursuant to the Agreement between the parties because that Agreement does not waive sovereign immunity, expressly reserves sovereign immunity, and states that authority to enter judgment on the basis of an arbitrator's decision is in the Tribal Court. Having so clearly structured this relationship to maintain sovereign immunity and to avoid assertion of federal court jurisdiction, the court simply cannot find that the assertion of tribal jurisdiction, as opposed to other actions against the Managers, is indicative of bad faith or a desire to harass.

This court cannot conclude that exhaustion of tribal court remedies would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction. The court notes that tribal remedies include both hearing of this matter before the Winnebago Tribal Court and possible appeal to the Northern Plains Inter–Tribal Court of Appeals. Furthermore, the United States Supreme Court has

> often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination. That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge. Moreover the orderly administration of justice in the federal court will be served

by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed. The risks of the kind of "procedural nightmare" that has allegedly developed in this case will be minimized if the federal court stays its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction and to rectify any errors it may have made. Exhaustion of tribal court remedies, moreover, will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review.

*Nat'l Farmers Union,* 471 U.S. at 856–57, 105 S.Ct. at 2454. Because the Tribe has not waived sovereign immunity, this court concludes that the Tribal Court should have the first opportunity to determine its jurisdiction over the matters in question.

 Even if this court could assert jurisdiction over the Tribe, it is not persuaded that federal question or diversity jurisdiction exist as the matter is currently pleaded. Because the Tribe entered into the Agreement as a governmental entity under Section 16 of the IRA, the Tribe is not a citizen of any state and cannot sue or be sued in federal court under diversity jurisdiction. *Gaines v. Ski Apache,* 8 F.3d 726, 729 (10th Cir.1993); *Standing Rock Sioux Indian Tribe v. Dorgan,* 505 F.2d 1135, 1140 (8th Cir.1974); *Oneida Indian Nation v. Oneida County,* 464 F.2d 916, 922–23 (2d Cir.1972), *rev'd on other grounds,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974).

The Managers have pleaded claims of breach of contract and refusal to arbitrate. The court cannot exercise subject matter jurisdiction simply because one of the parties is an Indian tribe and the case involves Indian property or contracts. *Tamiami Partners v. Miccosukee Tribe,* 999 F.2d 503, 507–08 (11th Cir.1993); *Stock West, Inc. v. Confederated Tribes of the Colville Reservation,* 873 F.2d 1221, 1225 (9th Cir.1989); *Martinez v. Southern Ute Tribe,* 249 F.2d 915, 917 (10th Cir. 1957), *cert. denied,* 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067 (1958). Nor will alleged breach of an arbitration clause directing arbitration pursuant to the Arbitration Act, 9 U.S.C. § 4, create federal question jurisdiction if there is no jurisdiction under title 28 of the United States Code. *Stock West,* at 1225. Finally, jurisdiction under 28 U.S.C. § 1337 fails because the Managers cannot identify any federal act regulating commerce or trade upon which to invoke federal jurisdiction. Title "28 U.S.C. § 1337 confers no jurisdiction of private contract actions." *Baker v. Riss & Co.,* 444 F.2d 257, 260 (8th Cir.1971). The court concludes that it lacks subject matter jurisdiction to hear this matter.

Upon the foregoing,

IT IS ORDERED

That defendant's April 18, 1994, motion to dismiss application for temporary and permanent injunction (docket number 11) is granted. This action is dismissed. Judgment shall enter in favor of the defendant.